IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

**RUSSELL GOODMAN, JR.;**
**RUSSELL GOODMAN, SR.;**
**and HELLEN SUE GOODMAN**                                               **PLAINTIFFS**

**V.**                          **CASE NO. 3:22-CV-3017**

**JIMMY DALE HARNESS,**
**in his individual capacity,**
**and in his official capacity**
**as County Judge of Searcy County;**
**and JOHN DOES 1-10**                                               **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Now before the Court are Defendants' Motion to Dismiss First Amended
Complaint (Doc. 30) and Brief in Support (Doc. 31), Plaintiffs' Response in Opposition
(Doc. 38), and Defendants' Reply (Doc. 39).   For the reasons explained below, the
Motion is **GRANTED IN PART AND DENIED IN PART**.

## I.   BACKGROUND

Plaintiffs Russell Goodman, Sr., and his wife, Hellen Sue Goodman ("Mr. and
Mrs. Goodman") own a tract of land south of Sanders Field Road in Searcy County,
Arkansas.  Their son, separate Plaintiff Russell Goodman, Jr. ("Junior"), is described in
the Amended Complaint as a "manager" but not an owner of this land.  (Doc. 25, p. 5).
It appears Junior received his parents' permission sometime in 2021 to enter the land
and clear brush and grass from an existing road, which Plaintiffs refer to as "Goodman
Road."  *Id.*   According to the Amended Complaint, Goodman Road had been
impassable, and no member of the public had used it for at least seven years before

1

Junior cleared it.

The Amended Complaint does not specify exactly where Goodman Road lies in relation to the Goodmans' tract of land and Sanders Field Road.  But Plaintiffs at least imply that Goodman Road is *different* than Sanders Field Road and that Goodman Road "traverses"—or cuts through—Mr. and Mrs. Goodman's private property.  *Id.* Also, the Amended Complaint omits the fact that Goodman Road provides access to the Buffalo National River, though Plaintiffs admit this fact in a brief filed the same day they commenced this lawsuit.  *See* Doc. 5, p. 6, Brief in Support of Motion for Temporary Restraining Order and/or Preliminary Injunction (acknowledging "there are alternative means available for the public to access the Buffalo River [other than Goodman Road], for example, nearby Maumee North public access (within a few miles by dirt roads)").

After Junior finished clearing Goodman Road on November 26, 2021, he placed a gate across it.  (Doc. 25, pp. 5, 15–16).  The gate cost approximately $3,700.00.  *Id.* at p. 16.  Sometime in January 2022, separate Defendant Jimmy Dale Harness, the County Judge of Searcy County, allegedly "stated"—though to whom and in what context the Amended Complaint does not specify—"that it was the position of Searcy County that the Goodman Road was private property."  *Id.*  Plaintiffs are also aware that "an unknown member of the public called Judge Harness and expressed interest in using the Goodman Road as if it were a county road."  *Id.* at p. 6.  On March 24, 2022, Judge Harness "expressed" to Junior that Searcy County's position on Goodman Road "had changed" and that the County no longer considered the road to be the Goodmans' private property.  *Id.* at p. 16.  Then, on April 7, 2022, "the Goodmans informed

2

Defendant Harness that neither he, nor any of his agents, had permission to enter the Goodman Property or touch the Gate." *Id.* Mr. and Mrs. Goodman claimed they "had seen no documentation" up until that point to convince them that Goodman Road was a county road. *Id.*

On April 13, unbeknownst to Mr. and Mrs. Goodman and Junior, Judge Harness filed with the Searcy County Clerk an order "clarifying" that "Sanders Field Road" was a public road and was "not to be blocked with a gate." (Doc. 19-4).[1] In other words, the order clearly refers to Goodman Road but calls it "Sanders Field Road." *Id.* In the order, Judge Harness states that Junior "is believed to be the person who has installed an [sic] gate and lock on Sanders Field Road." *Id.* Judge Harness then orders that the "lock on any gate blocking access to Sanders Field Road is to be cut off and the gate is to be left open until removed." *Id.* The gate is ordered "to be removed within 30 days." *Id.* Further, "[a]ny interested party" is directed to "contact the Office of the County Judge to request further clarification or to request any hearing thought to be necessary in this matter." *Id.*

Mr. and Mrs. Goodman claim they never received a copy of this order before County agents came to their land, cut the lock off the gate, and moved the gate off Goodman Road on April 14, 2022. (Doc. 25, pp. 16–17). Mr. and Mrs. Goodman did not contact the Office of the County Judge and request a hearing. They did not bring

---

[1] The order is discussed and cited in the Amended Complaint and therefore is embraced by that pleading. *See* Doc. 25, pp. 17–18. "Though 'matters outside the pleadings' may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Enervations, Inc. v. Minn. Min. & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004).

suit in state court; instead, they brought suit in this Court.  According to the Amended Complaint, on April 14 the "John Doe Defendants," under the direction of Judge Harness, "ripped out gate posts" and then "drove off the Goodman Road onto the Goodman Property, which caused damage and destruction to the Goodman Property." *Id.* at p. 17.

The next day, April 15, unnamed "agents" allegedly under the direction of Judge Harness returned to the Goodmans' property and encountered Junior there with his two-year-old child.  Plaintiffs contend that these unidentified men threatened Junior with assault and battery, attempted to inflict assault and battery on him, and "endangered the life" of his child.  *Id.*

Plaintiffs believe Judge Harness ordered his agents to remove the gate from Goodman Road "[i]n retaliation for the viewpoints and opinions expressed by [Junior]" on two Facebook pages maintained by Judge Harness.  *Id.* at p. 6.  Sometime in March 2022, Junior posted comments on Facebook that were "critical in nature of Judge Harness's performance, or lack thereof, of his official duties as County Judge."  *Id.* Because Judge Harness did not like Junior's viewpoints and opinions, he "blocked" Junior from the "Jim Harness" Facebook page and the "Searcy County Office of Emergency Management" ("Searcy County OEM") Facebook page.  *Id.* at p. 15.  Once Junior was "blocked," he was "prevent[ed] . . . from commenting on the Defendant's posts and events" on these two Facebook pages.  *Id.*

Junior acknowledges that "alternative means exist[ed] to view the Defendant's Facebook pages/profiles" but contends Judge Harness's decision to block him from

Facebook violated his First Amendment rights because Junior was no longer able to "participate in discussions or comment threads on the 'Jim Harness' and the 'Searcy County Office of Emergency Management' pages/profiles" or "participate in public discourse by responding to the Defendant's posts and events . . . ."  *Id.* at pp. 14–15.[2]

Plaintiffs assert that this Court's subject matter jurisdiction arises under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights jurisdiction).  There are also a number of state law claims in the Amended Complaint, and Plaintiffs suggest the Court should exert supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367. Defendants' Motion to Dismiss asks the Court to consider whether Plaintiffs' federal and state claims survive scrutiny under Federal Rule of Civil Procedure 12(b)(6).  The Court is also obligated to consider whether Mr. and Mrs. Goodman have adequately exhausted state remedies before seeking relief in federal court for their Fifth Amendment "takings" claim.  The same is true with regard to any federal Due Process claim they assert with respect to the "taking."

The federal claims against Judge Harness, Searcy County, and the John Does arise under 42 U.S.C. § 1983. Plaintiffs bring individual-capacity claims under § 1983 against Judge Harness and presumably the John Does who were acting under his

---

[2] It bears mentioning that the Amended Complaint sometimes refers to "the Plaintiffs" as having collectively suffered a violation of "their" First Amendment rights when "they" were blocked from commenting on certain Facebook pages.  *See, e.g., id.* at pp. 14–15. However, the Amended Complaint reveals no facts to plausibly suggest that either Mr. or Mrs. Goodman was blocked from Facebook. The Amended Complaint specifically claims that "Defendant has blocked *Russell Goodman, Jr.* from the 'Jim Harness' and the 'Searcy County Office of Emergency Management' pages/profiles." (Doc. 25, p. 15) (emphasis added). No similar facts are pleaded with respect to Mr. or Mrs. Goodman. Therefore, under Rule 12(b)(6), only Junior has asserted a First Amendment injury, and

direction.   Individual-capacity claims under § 1983 require a showing that an official, acting under color of state law, caused the deprivation of an individual's federal rights. *See Clay v. Conlee*, 815 F.2d 1164, 1169–70 (8th Cir. 1987).   Plaintiffs also bring official-capacity claims under § 1983.   An official-capacity suit is another way of pleading an action directly against the public entity employing the official—which in this case is Judge Harness's employer, Searcy County, Arkansas.   *See id.* at 1170 (finding that suit against an individual in his official capacity "is tantamount to an action directly against the public entity of which the official is an agent").

Counts 1, 2, and 3 of the Amended Complaint describe the First Amendment violations brought by Junior.   These Counts collectively claim that Judge Harness violated Junior's First Amendment rights under color of law by "block[ing]" him from commenting and posting on the "Jim Harness" and "Searcy County OEM" Facebook pages/profiles.  (Doc. 25, p. 15).   Junior contends that after he was blocked he could not: (1) engage in public discussions on the two Facebook pages, which he characterizes as public forums, (2) view and comment on "official statements" Judge Harness made available to the general public, and (3) use these pages to petition the government for redress of any grievances.   *Id.* at p. 19.   Junior analogizes the two Facebook pages to "digital town hall[s] where individual users receive information about Arkansas government and exchange their views on matters of public concern."   *Id.*   In Counts 1–3, Junior asks the Court to declare that Judge Harness violated his First Amendment rights and order Judge Harness to "unblock" him from the two Facebook

only he has standing to bring the First Amendment claims.

pages.  *Id.* at p. 20.  He further asks the Court to direct Judge Harness "or his office, [to] maintain records documenting the basis for any future decision to restrict a Facebook user's ability to interact with his official social media accounts . . . ."  *Id.*  Finally, Junior demands damages for the violation of his First Amendment rights.

Counts 4, 12, and 13 are brought by Mr. and Mrs. Goodman, the purported owners of Goodman Road,[3] and assert a deprivation of their Fifth Amendment rights[4] through the unconstitutional "taking" of their property. Count 4 explains that Goodman Road is, and has always been, Mr. and Mrs. Goodman's private property and was "taken" by Searcy County—through Judge Harness—without just compensation.  Mr. and Mrs. Goodman maintain that Judge Harness's April 13 order designating the road as "public" is void and unconstitutional because it was entered "without notice."  *Id.* at p. 24.  They demand Judge Harness provide them with proper notice in the future of any actions taken with respect to the road, and they seek money damages and declaratory relief for the unconstitutional "taking." Counts 12 and 13 are largely duplicative of Count 4.  Count 12 simply seeks a declaration that Judge Harness's April 13 order resulted in an unconstitutional taking, while Count 13 seeks a judicial declaration that the April 13 order is void for vagueness under the Due Process Clause of the Fourteenth

---

[3] Just as only Junior has standing to bring the First Amendment claims, only Mr. and Mrs. Goodman have standing to bring the "takings" claim, as only they are alleged to be the owners of the real property "taken" by Searcy County.

[4] Count 4 also cites to the parallel "takings clause" in the Arkansas Constitution at Article II, Section 2.  The Court is not aware that the Arkansas Constitution provides rights and privileges with respect to governmental "takings" that are substantively any different than those provided by the U.S. Constitution.

Amendment "[b]ecause of the lack of precise standards, coordinates, boundary descriptions, or other land description to judge compliance." *Id.* at p. 34. In other words, Count 13 asserts that the April 13 order's reference to "Sanders Field Road" is too vague to give Mr. and Mrs. Goodman, or any other members of the public, fair notice of the property rights claimed by Searcy County on behalf of the public.[5]

Count 9 sets forth the official-capacity claims against Judge Harness/Searcy County pursuant to § 1983. Plaintiffs blame Searcy County for "fail[ing] to control Defendant Harness in the face of an obvious need for training to prevent the violations described [in the Amended Complaint]," for "adopt[ing] and enforc[ing] an official policy or custom of utiliz[ing] the arms of County Government for [Judge Harness's] own personal gain," and for "concealing the fact Judge Harness was disqualified to be a County Judge." (Doc. 25, pp. 27–28). Count 10 appears to be an additional official-capacity claim characterizing Judge Harness's actions as an unconstitutional "land grab" and asking for declaratory and injunctive relief barring all members of the Searcy County Quorum Court, "mainly Judge Harness," from continuing the Quorum Court's alleged "policy, practice, or custom of enforcing land grabs . . . ." *Id.* at p. 31.[6]

Counts 5, 6, 7, and 8 are state law claims related to the "taking" of Goodman Road. Count 5 is a cause of action for the tort of civil trespass; Count 6 is a private claim for criminal trespass under Arkansas Code § 5-39-203; Count 7 is the tort of

---

[5] This position is ironic inasmuch as Plaintiffs have failed to provide a specific description of "Goodman Road" in the Amended Complaint.

[6] Neither the Searcy County Quorum Court nor any of its members have been named as defendants in this lawsuit.

abuse of process concerning the April 13 order and all subsequent actions taken by Judge Harness with respect to the road; and Count 8 alleges the tort of civil conspiracy between Judge Harness and his subordinates, the John Doe Defendants.

Count 11 seeks both preliminary and permanent injunctive relief as to the "continuous and repeated trespasses upon Plaintiffs' real property" related to the April 13 order and the alleged "taking" of Goodman Road.  *Id.* at p. 31. The Goodmans ask that Judge Harness (and anyone working for him in his official capacity) be enjoined from "accessing or entering Goodman Property . . . damaging and destroying the Plaintiffs' property, and . . . threatening or attempting to inflict assault and battery on the Goodmans."  (Doc. 25, pp. 31–32).

Finally, Count 14 seeks a declaratory judgment that Judge Harness is not fit to hold the office of County Judge.  The Court is not aware of any private right of action under the Arkansas Constitution to remove a duly elected individual from office.  Count 14 is therefore frivolous and will be **DISMISSED WITHOUT PREJUDICE** at the conclusion of this Order without further discussion.

## II.  LEGAL STANDARDS

### A.  Rule 12(b)(6): Stating a Plausible Claim

A complaint must be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted if the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555. Courts must liberally construe the complaint in the

light most favorable to the plaintiff and accept the factual allegations as true. *See Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 549 (8th Cir. 2008) (stating that in a motion to dismiss, courts accept as true all factual allegations in the complaint); *Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008) (explaining that courts should liberally construe the complaint in the light most favorable to the plaintiff).

However, "[w]here the allegations show on the face of the complaint there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is appropriate." *Benton v. Merrill Lynch & Co.*, 524 F.3d 866, 870 (8th Cir. 2008) (citation omitted). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Legal conclusions must be supported by factual allegations to survive a motion to dismiss.  *Id.* at 679.

### B.  Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction, and as such, are obligated to examine the basis for their jurisdiction. "Lack of subject matter jurisdiction, unlike many other objections to the jurisdiction of a particular court, cannot be waived. It may be raised at any time by a party to an action, or by the court *sua sponte*." *Bueford v. Resolution Trust Corp.*, 991 F.2d 481, 485 (8th Cir. 1993).

### C.  Supplemental Jurisdiction

Once original jurisdiction has been established over one or more claims asserted in an action, the federal court may exercise supplemental jurisdiction over any state law claims which it would otherwise lack an independent basis for jurisdiction. *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 349–50 (1988). Pursuant to 28 U.S.C. § 1367(a),

such supplemental jurisdiction is proper when the complaint brings state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Claims are considered to be part of the same "case or controversy" when they "derive from a common nucleus of operative fact and are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger*, *Assocs., Inc.,* 77 F.3d 1063, 1067 (8th Cir. 1996) (quotation marks and citation omitted).  Accordingly, supplemental jurisdiction exists where "the relationship between [the federal question] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

"After establishing that supplemental jurisdiction encompasses 'other claims' in the same case or controversy as a claim within the district courts' original jurisdiction . . . [§ 1367(a)] confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise . . . ." *City of Chicago v. Int'l Coll of Surgeons*, 522 U.S. 156, 173 (1997).  In particular, "[d]istrict courts also may be obligated not to decide state law claims (or to stay their adjudication) where one of the abstention doctrines applies."  *Id.* (citing *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)).

### III.  DISCUSSION

### A.  Federal Claims

### 1.  First Amendment—Individual Capacity

11

Counts 1, 2, and 3 assert that Judge Harness violated Junior's First Amendment rights when he "blocked" Junior from commenting, "liking," or "disliking" the comments of other users on the "Jim Harness" and "Searcy County OEM" Facebook pages. The Amended Complaint uses the terms "blocking" and "banning" interchangeably when discussing Facebook access. Junior agrees that a "banned" user "can still view the banning page but is prevented from using the Facebook platform to search for or reply to posts or other updates on the banning page." (Doc. 25, p. 9). Below, the Court will discuss whether any First Amendment claim has been stated as to each of the Facebook pages at issue.

### a.  *"Jim Harness" Facebook Page*

Junior maintains that Judge Harness uses the "Jim Harness" Facebook page, at least in part, "to carry out the business of County Judge of Searcy County, and uses it to publish information about government services and opportunities to his constituents." *Id.* at p. 10. The "Jim Harness" page has "approximately 1,300 friends," but Junior is no longer one of them. *Id.* at p. 12. Junior claims that Judge Harness acted under color of state law when he blocked Junior from commenting on the "Jim Harness" Facebook page, because, at that point, the page had been transformed from a purely personal social media page into a virtual public forum.

At this early stage of the litigation and with only the facts in the Amended Complaint before it, the Court knows very little about how Judge Harness operated the "Jim Harness" Facebook page at the time he blocked Junior. Judge Harness asserts he is entitled to qualified immunity, which "shields federal and state officials from money

12

damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

If the "Jim Harness" Facebook page is, as Judge Harness insists, just a personal Facebook page in which he merely announced his reelection campaign, posted photos of his family and friends, and only occasionally provided updates on County business, then this page would not likely bear enough indicia of an official state-run account to satisfy § 1983's color-of-state-law requirement under clearly established Eighth Circuit law. In *Campbell v. Reisch*, a case decided by the Eighth Circuit on January 27, 2021—before Judge Harness blocked Junior from Facebook—a Missouri state senator was found not to have acted under color of state law when she blocked a constituent from a Twitter page that she had created to announce her candidacy for office. 986 F.3d 822, 823 (8th Cir. 2021).

The *Reisch* court observed that a personal social media page is not transformed into a public forum simply because the owner of the page holds public office. It is axiomatic that "acts that public officials take in 'the ambit of their personal pursuits' do not trigger § 1983 liability." *Id.* at 824 (quoting *Magee v. Trs. of Hamline Univ.*, 747 F.3d 532, 535 (8th Cir. 2014)). The *Reisch* court cited extensively to two out-of-circuit decisions involving social media blocking, *Knight First Amendment Institute at Columbia University v. Trump*, 928 F.3d 226, 235–36 (2d Cir. 2019), and *Davison v. Randall*, 912 F.3d 666, 679–80 (4th Cir. 2019). Without deciding whether the *Knight* approach or the *Davison* approach was correct, the Eighth Circuit discussed both opinions and then

13

applied their general principles to the facts concerning Senator Reisch's Twitter account to hold that she did not transform her Twitter page into a public forum.  *See* 986 F.3d at 825–26.

In view of the holding in *Reisch*, it has been clearly established in this circuit that "[a] private [social media] account can turn into a governmental one if it becomes an organ of official business . . ."  *Id.* at 826.  However, proving that an official's social media account has been transformed in this way will require fact-intensive analysis of the account's history and usage. Some important factors considered by the Eighth Circuit include:  (1) whether the social media account was started before the owner became a public official; (2) the overall "theme" of the owner's postings on the account; (3) whether the account was only occasionally used to provide updates on legislation or to explain the effect of recently enacted laws; and (4) whether the main purpose of the postings was for the official to campaign for office or to "emphasize [the official's] suitability for public office."  *Id.* at 827.

At the Rule 12 stage of these proceedings, only the facts in the Amended Complaint may be considered.  Assuming these facts are true, Junior has plausibly stated a violation of his First Amendment rights.   He contends Judge Harness established the "Jim Harness" Facebook page while he was serving as County Judge and used the page "to carry out the business of County Judge of Searcy County," "to publish information about government services and opportunities," "to deliver public safety messages," "to inform his constituents of volunteer opportunities," and "to campaign for his election and reelection." (Doc. 25, pp. 10–12). Junior maintains the

"Jim Harness" Facebook page was a public forum, which Judge Harness blocked him from participating in because he disagreed with Junior's views and opinions. *Id.* at p. 19. Given these facts, the Court cannot say at this time that Junior did not suffer a violation of his First Amendment rights and that those rights were not clearly established at the time of the alleged violations.

Judge Harness may be entitled to qualified immunity at some later point in this litigation, but for now, Junior's First Amendment claims concerning the "Jim Harness" page survive Defendants' Motion to Dismiss.

### b. Searcy County OEM Facebook Page

The Amended Complaint claims the "Searcy County OEM" Facebook page is used by Judge Harness in his official capacity "to deliver crucial information about COVID-19." (Doc. 25, p. 13).[7] Comment threads on this Facebook page are "important forums for discussion and debate about community events, as well as the Defendant's policy positions and official acts." *Id.* Junior contends he was not entitled to comment on this page, view the comments of others, or engage in the types of debates with other citizens that one would ordinarily be permitted to participate in on a government-sponsored Facebook page.

First, the Court observes that this Facebook page is quite different from the "Jim Harness" page. The "Jim Harness" page is a personal page that Judge Harness

---

[7] Judge Harness protests that this page no longer exists, so there is no possibility for Junior to obtain prospective injunctive relief. Even if that is true, the claim is not necessarily moot in its entirety because Junior has also demanded "nominal and punitive damages" for the alleged violation of his First Amendment rights. (Doc. 25, p. 3).

allegedly transformed into a limited public forum by virtue of his use and treatment of the page as essentially official and governmental in nature.  By contrast, the "Searcy County OEM" Facebook page is an official social media page of Searcy County.  If, as the Amended Complaint contends, this page were interactive in nature and a means for citizens to protest the actions of their government and discuss with their fellow citizens the important issues of the day, then it is plausible that Judge Harness, acting in his personal capacity, barred Junior from viewing, posting, or interacting with this public page because of Junior's viewpoint and opinions—in violation of Junior's First Amendment rights.

Second, as to the question of whether Judge Harness is entitled to qualified immunity for his decision to block Junior from this County Facebook page, the Court finds that Junior has sufficiently stated a violation of his First Amendment rights and that those rights were clearly established at the time, per the Eighth Circuit's opinion in *Reisch*.  Qualified immunity is therefore denied as to the allegations concerning the "Searcy County OEM" Facebook page.

### 2.  First Amendment—Official Capacity

In Count 3, Plaintiffs assert: "The actions of Defendant Harness, a public official acting under color of State law *and whose actions are attributable to Searcy County, Arkansas*, constitute violations of the Plaintiffs' First Amendment rights." (Doc. 25, p. 22) (emphasis added).  Then, in Count 9, Plaintiffs state generally that they are bringing official-capacity claims under § 1983 as to the "policies and practices . . . implemented by Defendant Harness, and the agents, officials, employees and all persons acting in

16

concert with them under color of state law" that are "the proximate cause of Plaintiffs' ongoing deprivation of due process rights secured by the United States Constitution under the *First*, Fifth, Seventh, Eighth, and Fourteenth Amendments . . . ." *Id.* at p. 27 (emphasis added).

In *Pembaur v. City of Cincinnati* the Supreme Court found that an official "acting as the final decisionmaker for the county" took an action that made the county "liable under § 1983." 475 U.S. 469, 485 (1986). In *Pembaur*, a county prosecutor's "considered decision based on his understanding of the law" subjected the county to liability when that decision "directly caused the violation of [an individual's] Fourth Amendment rights." *Id.* at 484. The county prosecutor had commanded sheriff's deputies to forcibly enter an individual's private property to find and serve witnesses who had been subpoenaed to appear before the grand jury. *Id.* at 472–73. The officers, acting on the prosecutor's instructions, "obtained an axe and chopped down the door." *Id.* at 473. Under those circumstances, the county prosecutor's single command established county policy and subjected the county to liability under § 1983.

"To analyze whether a single decision of a government official constitutes an official policy, we look to state law to determine whether the government official possesses 'final policymaking authority in the area in which the challenged conduct occurred.'" *Thompson v. Shock*, 852 F.3d 786, 793 (8th Cir. 2017) (quoting *Williams v. Butler*, 863 F.2d 1398, 1401 (8th Cir. 1988)). Searcy County's chief executive—the County Judge—may only exercise those powers reserved for him in the Arkansas Constitution at Amendment 55, § 3, and as those powers are further defined at

17

Arkansas Code § 14-14-1102.

The Amended Complaint states no facts to support the notion that Judge Harness is considered under state law to be the final decisionmaker for Searcy County with respect to the maintenance of the County's official OEM Facebook page. That duty certainly does not appear in the Arkansas Constitution or in the Arkansas Code, and Plaintiffs do not assert Judge Harness maintained that Facebook page in accordance with a particular custom of Searcy County that has the force of law. *See Thompson*, 852 F.3d at 793 ("To determine whether a government official serves as the final policymaker, we consult two sources: (1) state and local positive law and (2) state and local custom or usage having the force of law." (quotation marks and citation omitted)). Without further facts to plausibly suggest that the maintenance of County websites and social media pages falls within the sole authority of the County Judge, the Court cannot construe an official-capacity claim against Searcy County. The First Amendment official-capacity claim is therefore **DISMISSED WITHOUT PREJUDICE**.

### 3. Fifth and Fourteenth Amendments: "Takings" and Due Process

The Court assumes for the purpose of evaluating the Motion to Dismiss that Judge Harness failed to provide Mr. and Mrs. Goodman with appropriate notice of his April 13 order regarding Goodman Road, in violation of Arkansas law. Even so, this failure does not implicate the federal Constitution, since "a sovereign vested with the power of eminent domain may exercise that power consistent with the constitution without providing prior notice, hearing or compensation so long as there exists an adequate [postdeprivation] mechanism for obtaining compensation." *Collier v. City of*

18

*Springdale*, 733 F.2d 1311, 1314 (8th Cir. 1984) *cert. denied*, 469 U.S. 857 (1984) (alteration in original). "[T]he mere exercise of the sovereign's power of eminent domain is not offensive to due process." *Id.* Moreover, courts "have refused to find a cause of action under 42 U.S.C. § 1983 where a plaintiff alleges a 'taking' of his property by the state without due process without first attempting to avail himself of the state mechanisms for compensation following the *de facto* appropriation." *Id.* at 1314–15.

Mr. and Mrs. Goodman bypassed local and state court processes for obtaining relief in favor of bringing their complaints directly to federal court.  But the law is clear that a plaintiff must exhaust all state-law remedies before seeking remedies for an alleged "taking" under the United States Constitution. *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195 (1985); *McKenzie v. City of White Hall,* 112 F.3d 313, 317 (8th Cir. 1997).

The Goodmans readily admit they did not attempt to access any state law procedures for contesting Judge Harness's order concerning the character and use of Goodman Road.  They explain they "were not parties to the docket that produced the Sham Order" and assume on that basis—without citation to law—that they were not obligated to pursue state law remedies.  (Doc. 25, p. 31).  However, there are only narrow exceptions to the rule of exhaustion, and Plaintiffs bear "the heavy burden of showing that the state remedy is inadequate."  *Cormack v. Settle-Beshears*, 474 F.3d 528, 531 (8th Cir. 2007) (cleaned up).  They have failed to do so here.  Under clear Eighth Circuit precedent Plaintiffs "must seek compensation from the state before proceeding to federal court . . . even in a physical taking case. This is so because when

19

the state provides an adequate process for obtaining compensation, no Fifth Amendment violation occurs until compensation is denied." *McKenzie*, 112 F.3d at 317 (internal citations omitted). "If the state provides an adequate remedy, then the federal court will not entertain jurisdiction of the case; otherwise it 'would be an unwarranted interference with state court jurisdiction.'" *Harris v. Mo. Conservation Comm'n*, 790 F.2d 678, 680 (8th Cir. 1986) (affirming district court's dismissal of §1983 "takings" claim based on lack of subject matter jurisdiction) (citing *Collier*, 733 F.2d at 1315). "To assume jurisdiction in a case of this type would mean the opening of a floodgate to a multiplicity of federal actions involving all aspects of state eminent domain proceedings which in truth should be adjudicated under state procedures and in state forums." *Collier*, 733 F.2d at 1317.

In *Chamberlain v. Newton County*, the Arkansas Supreme Court evaluated the case of a landowner who, like the Goodmans, maintained that her road had been unlawfully "taken" by the county. 266 Ark. 516 (1979). The court held that the landowner's "only remedy against Newton County was to file a claim in the County Court of Newton County for just compensation for a completed taking. Exclusive jurisdiction of appellant's claim for compensation is vested in the County Court of Newton County as a matter relating to county roads." *Id.* at 521. The same analysis holds true in the Goodmans' case with respect to the remedies available to them in the County Court of Searcy County.

Because Mr. and Mrs. Goodman failed to exhaust state remedies before pursuing their federal "takings" claims, the Court lacks subject matter jurisdiction over

these claims.  For these reasons, all federal claims under § 1983 relating to the road are **DISMISSED WITHOUT PREJUDICE**.

### B.  State Law Claims and First Amendment Retaliation

Counts 4–8 of the Amended Complaint assert state law claims related to the alleged "taking" of Goodman Road by Judge Harness/Searcy County.  First, the Court observes that the claims for trespass, abuse of process, and civil conspiracy are predicated on the facts surrounding the "takings" claim, over which the Court lacks subject matter jurisdiction.  Second, the facts material to the torts do not overlap with the facts material to the First Amendment claims.  It follows that since the "takings" claim has been dismissed, there is likely no supplemental jurisdiction over the torts related to the alleged "taking."

However, if the Court assumes for the sake of argument that the torts and the direct First Amendment claims in Counts 1–3 form part of the same "case or controversy" under 28 U.S.C. § 1367(a), the Court nevertheless declines to exert supplemental jurisdiction pursuant to the abstention doctrine established in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941).  "The *Pullman* abstention doctrine counsels restraint in the use of federal judicial resources under certain circumstances." *Robinson v. City of Omaha, Neb.*, 866 F.2d 1042, 1043 (8th Cir. 1989).  "*Pullman* requires a federal court to refrain from exercising jurisdiction when the case involves a potentially controlling issue of state law that is unclear, and the decision of this issue by the state courts could avoid or materially alter the need for a decision on federal constitutional grounds." *Id.* (quoting *Moe v. Brookings Cnty.*, 659 F.2d 880, 883

(8th Cir. 1981)).

Here, the state court's determination as to the disposition of the road controls whether the torts of trespass, abuse of process, and civil conspiracy were committed by Defendants.  Accordingly, the Court declines to exert supplemental jurisdiction over all state law claims in Counts 4–8, and they are **DISMISSED WITHOUT PREJUDICE**.

The Court will also dismiss any First Amendment retaliation claim that may reasonably be construed from the Amended Complaint.  Plaintiffs assert that the "taking" of Goodman Road—and all state law torts associated with that "taking"—was "[i]n retaliation for the viewpoints and opinions expressed by [Junior]."  (Doc. 25, p. 6).  Though the word "retaliation" is sprinkled here and there throughout the Amended Complaint, it is unclear whether Plaintiffs intend those references to serve as the basis for a separate First Amendment retaliation claim.  It could just as well be true that Plaintiffs knew their First and Fifth Amendment claims were factually unrelated and suggested retaliation as a means of justifying their decision to file all these claims in a single lawsuit.

Regardless, even if the Court were to assume Plaintiffs sufficiently pleaded a First Amendment retaliation claim, the Court lacks subject matter jurisdiction over the claim because the Court cannot make a finding that Mr. and Mrs. Goodman suffered an injury; that finding is reserved for the state court.  Accordingly, the First Amendment retaliation claim is **DISMISSED WITHOUT PREJUDICE**.

## IV. CONCLUSION

**IT IS ORDERED** that Defendants' Motion to Dismiss First Amended Complaint

(Doc. 30) is **GRANTED IN PART AND DENIED IN PART** as follows:

- Counts 1–3 survive dismissal, as separate Plaintiff Russell Goodman, Junior has stated plausible First Amendment individual-capacity claims as set forth herein against separate Defendant Jimmy Dale Harness;

- Counts 4–8 and 11–13 are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction under Rule 12(b)(1); and

- Counts 9, 10, and 14 are **DISMISSED WITHOUT PREJUDICE** under Rule 12(b)(6).

As the only causes of action remaining in the lawsuit are the § 1983 claims between Plaintiff Russell Goodman, Junior and Defendant Jimmy Dale Harness for alleged First Amendment violations, **IT IS FURTHER ORDERED** that all other Plaintiffs and Defendants in the lawsuit are **DISMISSED WITHOUT PREJUDICE**.

Plaintiff's counsel is directed to advise the Court in an email with a copy to opposing counsel as to the status of the Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 4) and need for an evidentiary hearing on that motion. Even if the motion is now moot, the Court anticipates the Case Management Hearing will take place as scheduled on June 17.

**IT IS SO ORDERED** on this 16th day of June, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE